Richard Waugh on behalf of Plaintiff Appellant Mary Merklin. Ah, well, ERISA, one of our favorite topics, I'm sure, here. I know how difficult it is for you to have to deal with all this time. And, you know, I'm going to waste a little bit of my time just thinking about something, and that is our district courts are backed up something fierce. And to have these cases have to go to the district court judge rather than maybe a change in the rules and let's mandate them to magistrates first or something to help with the backlog, I just say that by way of aside with respect to judicial administration. And because our judges are so busy and don't have the time to look deeply into these things, we end up with situations like the Mary Merklin case that we have here this morning where the judge went off on an issue that everybody agreed was not an issue. I suspect the reason that the judge went off on this part-time work capability issue, even though the briefs on the motions clearly stated it was not a relevant issue in the case, and the briefs on appeal confirm that as well, I think what happened is that it came up during oral argument. And what I think happened is that the judge, in thinking about this matter after taking it under advisement, probably played the tape of the oral argument rather than re-reading the briefs, which caused the judge to make a material mistake of fact and law in reaching her decision. This is a case that involves comorbidity issues. And any time we have comorbidity issues in these disability claims, it always creates havoc with the record. There's no dispute that Mary Merklin suffers from diabetes, severe asthma, tears in both knees, degenerative arthritis, hypertension, heart murmur, chest palpitations, chest pains, episodes of syncope, which have become kind of important in this case. Those are blackouts or fainting spells, if you will, memory loss, disorientation, chronic fatigue syndrome. These are just some of the laundry list of her problems. And then ultimately depression. But it's interesting to note, when you read the record in this case, that the depression started treatment after she had already stopped working because of all of her physical problems. And Dr. Manka, in his report that's part of the abstract record, is – I forgot to write my time down when I started. Even so, you could read the reports, in effect, to say otherwise. And I think it's interesting to note that in this case, why is it an abuse of discretion for Liberty to have result ambiguity? Well, you know, it's an abuse of discretion whenever the carrier fails to engage in, as Jebian, you were just talking about, puts it, a good-faith bilateral exchange of information. You know, the record here from the get-go is that there's been things that have been omitted or hidden or misrepresented to the planned participant by the carrier. We talk about fiduciary obligations, and we throw that word around a lot. But what are we really talking about in terms of what the obligations of an administrator like Liberty are? I think certainly we'd all agree full disclosure is a paramount concern in any administrative process. And it's not only full disclosure as to the policy provisions, which by regulation and rule R have to be stated in the denial letters, but it's also full disclosure about the reason for the denial. Well, it's a – okay. You know, this thing went through five or six reviews. Yes, it did. And there was a time period for a very short time when Liberty questioned itself as to whether she really was disabled on account of a mental problem or account of a physical problem. Very brief period of time. Apart from that very brief period of time, it's a fairly consistent view. That it was the first couple of years, disability on account of mental condition. All right. Well, let's deal with that issue first of all. I don't know what you, Judge Reiner, mean by a short period of time. It was at least 18 months while payments are being made. So for three-quarters of the time that payments were being made. No, it was September 98 through November 98 was the period. Right. The 18-month period during which they questioned whether it was – could have been one or the other. But in truth, that was never resolved from the start of the claim. It was coming up at – that was the 18-month period, and they're looking at the claim and they realize, you know, we've never been able to put our finger on whether this is a mental nervous or a physical disorder. We're 18 months into the claim. And then they start looking at that particular issue. Now, I'm not so troubled by that, Your Honor, as what happened later on when they write to the participant and say, we approved your claim on mental nervous. That was not true. That wasn't this representation. Because as you yourself had just pointed out, 18 months into the claim, they still didn't know. They just approved it without picking one or the other. And then when it was coming up to the two-year period, and let's face that issue as well. You know, the self-interest issue in these cases where we have situations like Mary Merklin's is if you can peg it into a mental nervous, they're going to do it because it shortens their exposure. And that's just the reality. We can talk about, you know – Okay. What is it exactly that you say they should have done that they didn't do? Should they have sent some letter to the claimant saying we're granting disability based upon your mental state? I mean, is that what they should have done that you're complaining about? Or should they have – Yeah, that's one issue. Internal document. Well, I'm just trying to figure out what it is that they should have done that you – They should have done is been candid with the insured, told them everything that they discovered. I mean, we haven't really talked about the salient – the most salient issue is look how they handled these internist report. I mean, the participant is pleading over and over, don't cherry pick and piecemeal me with an orthopedist or a cardiologist. You need an internist because I've got this global constellation of problems, and that's the only skilled person that's in a best position to comment on that. And it took a long, long time before and a lot of letter writing by the Merklins before the company finally agreed to do that. Then they – the first report they get from Dr. Massey says, so this lady can't work more than four hours per day. That report disappears from the file. I mean, you know that. It wasn't there when the file was produced at the beginning of this litigation, and it's only after I reviewed the file and saw something's missing here that that document was ever produced. Then secondly, they say it was unsatisfactory, you know, and criticize Dr. Massey's report, turn around and send it to another internist. I mean, excuse me, Dr. Forbes' report was criticized. The second internist was Dr. Massey. Turn around and send it to him, and he writes back to them, this woman is disabled from working. And the two things that he points out in his letter are, number one, memory loss, and number two, at the end of his letter, episodes of Syncope, which are these blackouts and feigning spells. Now, what happens? In a good faith bilateral exchange of information, you should be telling your plan participant what you're discovering through these processes. You just don't write a letter and say, here's all the bad things and the reasons why your claim doesn't fly. Don't we have a certain good faith fiduciary obligation to open it all up and say, look, there are some things here that support the claim, but we question these. That would at least give the plan participant an opportunity to get better documentation from her own internist to deal with those things, support what the findings were of the company's internist. I mean, I do a lot of this work, and you see a lot of these cases. I didn't take this file because it involves a great deal of money. I took this file simply because I'm looking at it. It just shocked my conscience what they did to then deny the claim ultimately, quoting verbatim from Dr. Massey's report letter with the exception of leaving off the last sentence where he says she's disabled from working. I mean, fiduciary obligations, a trust relationship. I've never seen such a record that suggests that there was total self-interest in the handling of the claim. And then the other shocking thing is if these internist reports that they got were so invalid and unsatisfactory and subject to criticism, how dare they turn around and use it as the basis for the final denial? Why didn't they tell Mary Merklin, well, Dr. Massey said all of this stuff, but we think his report's unsatisfactory and invalid and conclusory and lacks good analysis, instead of using it to make her think in their final denial letter that it provided a basis that justified the denial of the claim? So I don't know how much time I have left here, and I do want to save some time. We have nine minutes. Oh, good. Then I'll take another four minutes to talk about some other things. There are so many other things. I'd like to talk to you, Judge Reimer, about your decision in SAFL. Everybody in this circus loves it, because what do you talk about? Basic things. If it's not stated in the plan, you can't use it to justify denial. There it was a question of accommodations to the work environment. Here it's such things as part-time work, which is a non-issue, and yet this is what the district court went off on. But it's also objective medical evidence. Now, gosh, I know that you guys hear about this all the time, and it's really a problem in the real world, and let me tell you about it. Is the opinion of a treating physician subjective or objective evidence? When I ask this question of those people in the insurance industry, sometimes I hear yes and sometimes I hear no, because what is objective medical evidence, which isn't in the plan anyway and is never defined anywhere to tell us these things? But let's say. Let's say that it's subjective. All of the opinions that the insurance company gets from its consultants are equally subjective. How they can say there's no objective medical evidence to support a claim when they're relying on subjective medical opinions of their own reviewing documents? I suppose it has something to do with X-rays and things like that. I've always thought that what that distinction means is that there are some forms of medicine which you can test for, for example, elevated blood counts or too many white blood cells or whatever, which confirm the diagnosis that the physician recommends, but that there are other sorts of injuries, and mental illness is probably a good example, but soft tissue injuries might be another where it's very hard, other than to take the word of the patient that they're suffering from it, to verify it. Isn't that the difference between objective and subjective evidence? I think it is sometimes. But let's take it this way. If a consultant for the insurance company says, I don't believe there's any objective evidence to support this claim, that's his conclusion and analysis based upon test results or whatever. But that opinion is still subjective. It's his conclusion. Again, we're drawing a conclusion from facts. That's a science. That has as much to do with the fact that medicine is as much an art as it is a science. All right. Then let's flip the coin around. Now we've got all the treating physicians. Okay? There is not one place in here where at any time in this record, and this is very common, where the insurance company says to the treating physicians, what objective medical testing, what objective medical things do you find? Let's look at Mary Merkman's case. The primarily disabling conditions, as we know, are memory loss, syncope, disorientation. There's no way to test for these things. They simply happen. I suffer from vertigo, and pray the Lord I don't drop on this floor and vomit all over here, because I never know when it's going to happen. I can report that to my doctor. The insurance company calls it anecdotal. But, I mean, this is patient history. This is what doctors traditionally have relied upon. And so, you know, it's in the medical record. It's in the chart. And when the doctor says, you know, here's what the patient history is, and from these facts I draw this conclusion, that is objective medical evidence, even though it's not testing. I'm not sure we're going to resolve this debate here. No, I agree. Let me just make sure that I understand that the most significant material breach that you allege of the fiduciary obligation is the lack of candor with regard to the cherry-picking and the reports of the internist. Any other material factor that you would cite to me to support the legal conclusion that there was a breach of fiduciary duty? Oh, sure. Sure. Saying that it had been approved initially for mental nervous when, in fact, that wasn't true. Taking, taking, relying on Massey's report to deny the claim, but not relying on it for supporting the claim is another example. The part-time work issue, by the way, just so you understand, and we all know it's been off on it, it happened because of a statement made in oral argument by counsel for liberty that part-time work was an appropriate way of grounds for denying the claim. So I don't want to chide counsel about that in oral argument. We say a lot of things and don't realize what we're saying. But in this case, it just happened to capture the judge's attention, and off we went, even though everybody agreed that it wasn't an issue. How much time do I have left? Four minutes. Four minutes. That was a cheap trick by opposing counsel. I can tell you for a fact that opposing counsel is a fine lawyer and an excellent colleague. I was only joking. As are all the people we get to deal with down in our jurisdiction. I'm delighted to say. You know, I'm just going to save my time to see how things go here and follow up as need be. Thank you. All right. Then we'll hear from Mr. Hensley. May it please the Court. My name is Michael Hensley. I have with me my partner, Eileen Gilbride. We are representing Defendant Applee, Liberty Life, in this case. Let me answer the question that was left, I think, because of what my colleague argued. Why is Mrs. Merklin disabled? From her own treating physicians and psychiatrists, she's disabled because of major depression. Even though she has multiple physical issues, she can, even with syncope, work sedentary work full time. That's what her own cardiologist, Dr. Weber, said. So that's why she's disabled. That's why this decision was appropriate. First, I want to address three points with the Court. I'm going to talk about the fact that the appropriate standard of review to be applied in this case was the abuse of discretion standard as applied by the district court. But I think a review of this record will show that even if you were to review it de novo, that the decision of the district court was appropriate. Secondly, I'm going to talk about the district court's proper application of the abuse of discretion standard. And finally, I'm going to address the argument that the mental and nervous disorder language of the Liberty Plan is ambiguous. I do want to point out, we believe that's been waived, as that was never raised at the district court level, was never considered by the court, and it's hard for this Court now to review that when it was never dealt with below. The proper standard of review in this case is abuse of discretion. There isn't any dispute that in this particular case, the plan language vests the not only to determine claim benefits, but also to interpret the plan. Not at issue. Consequently, unless this Court, actually the district court, were to find some conflict tainted the decision, then the abuse of discretion standard is what applies. There isn't any conflict in this case. Plaintiff argues that there are essentially three areas where this conflict of interest might arise, and again, it's not supported by the record. The first argument they make is that Liberty took inconsistent positions on the basis for paying the disability benefits in this case. That's not what the record says. When disability benefits were applied for, Dr. Manka submitted an attending physician statement, and that's in the record, Excerpt of Record, tab 18, page 65, that said she has a number of issues, but under the second page it says, Then you'll see in the record as well that there is information provided by the Arizona psychiatrist working for Mrs. Merklin, Mrs. Leitz, Dr. Leitz, and again, it's the psychiatric issues. The record again, tab 18, page 3, shows in the Liberty notes that they specifically said we now have enough evidence to substantiate paying this claim on a psychiatric basis, case management not now indicated, removed from assignment. So when this case was originally paid, it was paid based on the evidence of a psychiatric disability. The Court talked about the September 3, 1998 note, and it's very important to look at that, and again, that's tab 18, page 11, because it doesn't say what plaintiff wants you to read it to say. It doesn't say Liberty is now changing its position on why it's paying this claim. What it is is the claimant is wanting now to say that there's medical issues. It says CL changed from M&N to sickness. CL is claim. And what you'll see in the record following that is Liberty then setting out to contact the treating doctors to at that point now say what is the primary disabling cause and is there another disabling cause that is not mental and nervous. Again, between November and December of 1998, the record shows that they went to the treating cardiologist, Dr. Weber, who opined that she had syncope, she had other issues, but his testing of her cardiac system was negative and that even with evidence of syncope, she could work sedentary job full time, not four hours a day, but full time. The nurse or the psychiatrist was asked to tell us what's the primary disabling cause. You'll see she submits a letter and says, number one, major depression. So at that point, it's clear that the reason for the disability is mental and nervous. Liberty communicates that to Mrs. Merklin in February of 99 and tells her at the same time that her benefits will expire when the mental and nervous period is over. Consistently throughout, this claim has been paid on mental and nervous, never on a physical condition. No conflict there. The second argument that they make to say that there's a conflict of interest is they say that Mrs. Merklin was misled, yet they don't cite one single letter, communication or note where Liberty said to Mrs. Merklin, we're paying your benefits on physical. It's not what's there. Their argument is based upon a statement in the final letter when disability benefits were terminated that said initially approved for the 24 months based on a primary diagnosis of major depression. Now, we could argue semantics, but that is what the file shows. They had the evidence of a psychiatric issue, paid disability. When the alternative issue came up, the potentially another issue, it was investigated, it was maintained at psychiatric, and that's what Mrs. Merklin was told. There's no evidence of conflict of interest on that issue. The third argument that they make to try to say there's a conflict of interest is an argument that somehow Liberty manipulated the independent review process. And they make a couple of issues or raise a couple of issues there. They say Liberty didn't have an independent medical examination done, and therefore that's evidence of manipulating the review process. They haven't cited to you because there isn't any language in this plan that says you have to have an independent medical examination of someone under any circumstance. That's not evidence of manipulation of the review process. Further, during the time of 1997 to 1999 when those benefits were paid, the treating cardiologist and the treating psychiatrist, again, confirmed she was disabled from a psychiatric reason, not a physical. Liberty went before they terminated the benefits and went to an independent cardiologist and an independent psychiatrist. Dr. Eisenberg was the psychiatrist, the doctor – sorry, the other doctor is slipping my mind here. But he both confirmed that the treating doctors were right. She could work full time based on physical. Going and getting those doctors to confirm so that before the benefits were terminated looks to me like it's handling the review process appropriately, not manipulating it. The last argument seems to relate to the internist Dr. Forbes and Dr. Massey. And they say that's where the evidence of the conflict of interest arises. As the Court noted, about the fifth time, eight months after benefits were denied, Mr. Merklin writes the CEO of Liberty and says, have an internist look at this. So they do. The claims handler asks the nurse, the MDS notes that you'll see in the record, shows that they retain Dr. Forbes. Dr. Forbes gives the opinion that is supportive of Liberty. She can work a sedentary job. And he even says, I talked to Dr. Kennett, Mrs. Merklin's treating cardiologist or treating internist. He agrees she can work four hours a day. But there were other questions that that nurse had wanted answered, and he didn't answer them. She tried to get him to answer them and he wouldn't. So even though the evidence was helpful to Liberty, what did she do? She went out and got another internist, Dr. Massey. Dr. Massey came back and he commented on issues he wasn't even asked to comment  on. That's why his report was criticized. They didn't ask him to talk about the psychiatric issue. They knew from a psychiatric standpoint she was disabled. But that was three-quarters of his report. But what's important in his report is that he says recurrent episodes of syncope would mean she couldn't work. But there is nothing in this record that shows recurrent episodes of syncope. In fact, between the relevant time period, 97 and 99, there were only two episodes, early 97, and their own doctor indicated despite that as being a potential symptom, she can work full time. So the next argument seems to be that because all of Dr. Massey's report wasn't included in the letter that said for the fifth time we're upholding our determination of benefits, they claim that somehow that's hiding the ball, hiding the record. What was put in the letter was what was pertinent. They were telling her that the decision had been to terminate benefits because her treatment was psychiatric. That's exactly what Dr. Massey said. There was no reason to comment on the syncope issues because she wasn't having them. There was no evidence in the record, clinical, that she was having syncope. And, again, I think the critical part is her own doctors, less than five months before these benefits are terminated, knowing syncope fainting occasionally happens, said she could work full time in a sedentary position, not just four hours a day. And when the letter came out the next day or the two days later, Mrs. Merklin asked for a copy of Dr. Massey's full report. It's produced. If they really wanted to manipulate the record, they wouldn't have done that. Finally, they argue that because in the litigation, when the claim file was originally produced, Dr. Forbes' report was missing. It's somehow evidence of manipulation of the independent review process. That's in the litigation. That's not in the claim or the appeal handling. Irrelevant, really. But more importantly, if they wanted to manipulate the record, the notes that were in the file indicating that there had been an electric transmission of Dr. Forbes' report, they'd have been scrubbed clean as well. They weren't. That's how counsel, myself, along with Mr. Waugh, realized it was missing, immediately was produced. And it's a report that helps liberty. Why would they, you know, hide it? So the bottom line is, from the three arguments plaintiff has made that there's a conflict of interest, just not supported by the record, the district court below applied the proper standard, which is abuse of discretion. And as this Court knows, when you apply that standard, you have to give great deference to the district court's decision. And unless you find clearly erroneous decision by that court, you must uphold  That's not what you find in this case. And there was an argument that they went off on the four-hour-a-day issue. That's not what she did. She used that as part of the evidence, whether you call it some evidence, substantial evidence, significant evidence. This record is replete with evidence, and not from independent folks, but from Mrs. Merklin's own doctors, that says she can work full-time sedentary based on physical. Her depression is what caused the disability. Finally, the plaintiff argues for the first time on appeal that the planned language on the issue of mental and nervous disorder is ambiguous. That issue shouldn't be considered by this Court again because it wasn't raised below, and it's critical here. It's not a technical issue, because in the Lange case, which came out after the Patterson case cited by the plaintiff, they said that if you find that the district court had an abuse of discretion authority, and that's the way they were reviewing the claim, they also have that same level of standard when they interpret the language of the plan. And here, because it was never raised as an issue below, we don't have any interpretation by the district court for you to review one way or another on that issue. It's been waived, and it's important. And more importantly, if the Court were to consider that issue, the language in our plan is different than Patterson, and we don't believe there is an ambiguity, and we wouldn't get there in the first place. But we never had that opportunity to raise that below. In closing, Liberty respectfully requests that you apply the abuse of discretion standard of review and affirm the district court's well-reasoned decision in this case. If you decide or are concerned that there's some evidence of conflicts hating the record, it's not appropriate for you to overturn the decision in grant benefits because there never was a proceeding below where Liberty was given the opportunity to rebut the tainted alleged taint because this was a summary judgment proceeding. It would be inappropriate to overturn in grant benefits. And finally, if you decide to deal with the ambiguity issue, which we think you shouldn't, again, that needs to be remanded because we have an opportunity to show why it's not. Thank you. All right. Thank you, Mr. Wall. I'm so surprised by your silence this morning after listening to the earlier arguments where you have so many questions. You don't seem to have so many in this case, and I don't know whether that's a good, bad or indifferent sign, but let me start with the question of this only depression. The record's clear, and I have not enough time in four minutes to go through every excerpt of record site, but it's covered in detail in the briefs. I think both of the briefs on both sides were beautifully written and all the information you need. Counsel, from my standpoint, that's one of the reasons why you haven't heard a lot of questions from me. You both did a really good job of briefing and arguing the case. And I usually ask lots of questions when I simply can't figure out what happened. Thank you for the compliment. Both of us appreciate it immensely. Well, let me tell you, you know, Mike's a great lawyer because he just raised an issue that I haven't heard of until we got here, saying that we've waived ambiguities on mental nervous disorders a la Mangaluso and Lang because it wasn't presented to the lower court. That issue isn't even in their brief. It's not been argued until he stood up here and argued it. And while I respect his abilities to find these additional issues, it's the first time we've heard about it. It's not in the briefs. But let's talk about it just briefly. We all know that in this circuit on mental nervous disorders, when you have a broad, general definition that it means any mental, nervous, or emotional disorder, that our cases say, hey, if Mangaluso specifically says, and I'll quote it here, if either a cause or symptom of the disease were physical, either a cause or the symptom of the disease were physical, and caused the disability in whole or in part, then benefits are payable for a physical disability, not a mental one. Now, let's go back to the, what are the salient issues? Syncope, memory loss, disorientation. Are these symptoms of a mental disease? If they are, and if that's, everybody agrees that's in the record, then under these cases, the mental nervous limitation doesn't apply, because these are physical symptoms, if not actually physical diseases themselves. Syncope is a physical condition. Secondly, with respect to Mr. Hensley saying there's no evidence of recent episodes of syncope, again, I would simply point out that in May 1999, Dr. Eisenberg, their own psychiatrist, talked to the treating psychiatrist, Dr. Leet, and wrote, quote, recent episodes of syncope in his notes. That's May of 1999. In February of 2000, Dr. Kennett, the treating internist, writes, quote, on several occasions fainted, should not drive due to syncope, in his letters to Liberty. These syncope issues aren't something in the past. These are ongoing, unpredictable problems with this woman. Finally, her husband writes in June 2000, in as many letters, trying to get an IME, or trying to get him to get it to an internist who can look at her global conditions, specifically says that his wife has had two episodes of syncope or passing out or fainting in the past six weeks. Now, maybe they say, hey, it's not in the medical records, you know, per se. But it was in the medical records. But even if it wasn't, when the participant reports these things to the insurance company and we start talking about fundamental fairness and basic honesty and a bilateral exchange of information and all the fiduciary obligations that the plan administrator has, then it seems quite clear that they have to credit this information. And they don't get to stand up and say, hey, it's not in the medical records because somebody wrote it in a letter to them. Thank you very much. I would simply say by way of remedy, we really ought to reinstate the claim and have it go forward from here with instructions to the defendant to continue to administer the claim according to the terms of the plan. And if something happens in the future, we'll revisit it then. Thank you very much. You've been very nice today. Bye-bye. Thank you, both, for the matter just argued. And the matter will be submitted and the Court will stand in recess for the day. Bye-bye. And next time we'll supply the alarm. The Court will stand and hear.
judges: Rymer, Tallman, Bea